# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| COMMONS OF BELTON DEVELOPMENT, LP; COMMONS OF BELTON DVLPR, LLC; JABAL COMPANIES, LLC; and CALVARY UNIVERSITY,<br><br>              Plaintiffs,<br><br>      v.<br><br>CITY OF BELTON, MISSOURI and BELTON CITY COUNCIL,<br><br>                        Defendants. | Civ. Action No. _____<br><br>**COMPLAINT**<br>Jury Trial Demanded |

## INTRODUCTION

1.       Plaintiffs Commons of Belton Development, LP; Commons of Belton DVLPR, LLC; Jabal Companies, LLC ("Commons of Belton Plaintiffs"); and Calvary University (collectively "Plaintiffs") bring this action pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and Missouri common law to redress injuries caused by Defendants City of Belton, Missouri and Belton City Council's (collectively the "City" or "Defendants") unlawful actions that have prevented the construction of the Commons of Belton ("the Commons"), a multi-family affordable housing development in Belton, Missouri.

2.       In early 2024, the Commons of Belton Plaintiffs, at the urging of City officials, began the pre-development process for building a 252-unit affordable housing apartment complex in the City of Belton, a predominantly white suburb that shares its northern border with Kansas City, Missouri. The proposed development would provide affordable units for the area's lower income families and workforce, who are disproportionately Black and in significant need of affordable housing opportunities.

3.     The concept for the Commons was formed when the Commons of Belton Plaintiffs started discussions with the City about developing a small affordable housing community. The City responded by suggesting that the Commons of Belton Plaintiffs purchase a larger, City-owned parcel of land and build a much larger affordable housing development. The City recognized its substantial and growing need for affordable housing units to accommodate the expanding workforce, including for new and existing employees of the recently expanded Honeywell Kansas City National Security Campus as well as the large Chewy's and QuikTrip distribution centers located within Belton. The Belton Planning Commission explicitly noted that the Commons might be the only project in the foreseeable future that could provide affordable workforce housing near the growing employment centers in and around the City.

4.     As the Commons of Belton Plaintiffs began their pre-development process, City officials, including many Council members, expressed their strong support, signing a letter of intent and a purchase option agreement for the City parcel where the Commons would be developed. Based on the City's representations, the Commons of Belton Plaintiffs invested significant resources to design the project, including completing initial architectural, engineering, and market studies, and obtaining low-income housing tax credits (LIHTC) and other financing to proceed with the project.

5.     The Commons of Belton Plaintiffs also contracted with Calvary University to purchase an adjoining parcel of land that, along with the City parcel, was necessary for the development of the project. As part of the sale of the University parcel, the Commons of Belton Plaintiffs also agreed to build the University a competitive soccer field that would allow the school to build its athletic program.

6.     The Commons project was fully on track until the City's support abruptly ended in response to the mobilization of a vocal minority of Belton residents who rallied against the development at the May 2025 Planning Commission and City Council meetings. The neighbor opposition was steeped in discriminatory rhetoric, making clear that these City residents did not want a disproportionate number of Black families and families with children moving into an affordable housing development in their neighborhood. The Planning Commission and City Council acceded to the discriminatory opposition and voted to deny the Commons of Belton Plaintiffs' application to rezone the parcel to a multi-family use designation. The denial of the rezoning application immediately and completely stopped the project. Today, the parcels sit undeveloped, affordable units remain scarce, housing needs increase daily, and Calvary University athletes practice off-campus.

7.     Defendants' actions have caused Plaintiffs to suffer substantial and irreparable loss and injury. The Commons of Belton Plaintiffs will lose substantial pre-development investments connected with the purchase contract, LIHTC, and pre-development activities. The Commons of Belton Plaintiffs will not receive their expected developer fee as part of the tax credit financing and will lose substantial post-development income as the owners-managers of the Commons. Plaintiff Calvary University will neither receive the income from the sale of its parcel nor have its expected soccer field built. Absent the soccer field, the University cannot start its women's soccer program and cannot effectively recruit male soccer players, resulting in lower student matriculation. The University has suffered harm to its institutional standing and decreased enrollment, jeopardizing its accreditation status.

8.     The City's actions have the purpose and effect of discriminating on the basis of the race and familial status of the likely residents of the Commons and have the effect of

3

perpetuating racial segregation in the City of Belton by reducing opportunities for families of color to live in the overwhelmingly white community. Defendants' discriminatory actions also constitute unlawful interference with the Commons of Belton Plaintiffs' ability to make affordable housing available to all free from discrimination. The City's conduct has interfered with the Commons of Belton Plaintiffs and Plaintiff Calvary University's business relationship.

9.    Plaintiffs seek a declaratory judgment, injunctive relief, and damages for Defendants' unlawful conduct. This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*, and Missouri common law.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 1367, 2201, 2202, and 42 U.S.C. § 3613(a).

11.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the claims arose in the District, Defendants are incorporated in and reside in the District, Plaintiffs do business in the District, and a substantial part of the events giving rise to this action occurred in the District.

## PARTIES

12.    Commons of Belton Development, LP is a Missouri limited partnership that is the applicant for the LIHTC and will be the owner-manager of the Commons upon completion.

13.    Commons of Belton DVPLR, LLC is a Missouri domestic limited liability company established for the purpose of developing workforce rental housing on an undeveloped parcel of land, spanning 8.03 acres, located at 1202 Westover Road at the corner of Bong Avenue and Westover Road, behind Calvary University's Student Life Center in Belton, Missouri.

4

14.     Jabal Companies, LLC is a Missouri domestic limited liability company engaged in the business of the development of residential and commercial projects in and around the Kansas City, Missouri area. Jabal Companies officers formed the Commons of Belton entities, and the company has expended resources associated with the pre-development activities for the Commons.

15.     Calvary University, established in 1932, is a private Christian university, and the only university located in Belton. Calvary owns 1.16 acres of the undeveloped plot of land intended to be used for the Commons development. Calvary entered into a Purchase Option Agreement with the Commons of Belton Plaintiffs to sell one acre of real property for development of the Commons and to have the Commons of Belton Plaintiffs build a soccer field for the University.

16.     The City of Belton is a city in Cass County, Missouri that borders Kansas City. It was platted in 1871, became a Charter City in 2008, consists of approximately 14 square miles, and has a population of approximately 24,000 residents. Belton operates under a city council form of government.

17.     The Belton City Council performs the legislative duties of the City and sets the policies of the City, which are implemented by the City Manager. Two City Council members are elected from each of the four wards for staggered three-year terms. The Mayor, also elected by Belton citizens, is a voting member of the City Council and has veto power. The City Council is responsible for voting to approve or deny requests to rezone parcels of land.

## FACTUAL BACKGROUND

### The Commons Affordable Housing Development

18. The Commons was designed to be a community of 252 rental apartments across seven three-story buildings divided equally between one-bedroom, two-bedroom, and three-bedroom units. The development would also have a leasing office, clubhouse, pool, two playgrounds, and a barbecue area.

*Figure 1: Building Plan for Commons of Belton Development*



19. The Commons would be located at the southwest corner of Westover Road and Bong Avenue, with the Eagles Landing public golf course to the west, Calvary University to the

north, and the Army Reserve Center to the south. Kansas City, Missouri borders the property, with Bong Avenue separating Kansas City and Belton.

*Figure 2: Google Map Image of Proposed Plot and Surrounding Area*



20.    The project would be built on an undeveloped plot of land, spanning 8.03 acres, including 6.87 acres owned by the City of Belton and the remaining 1.16 acres owned by Calvary University.

21.     The city-owned portion of the property was deeded to the City of Belton in 1984. The parcel's zoning was designated as parks and recreation in 1992, designated as commercial land in 2011, and then redesignated as parks and recreation in 2024. The land has never been developed. The empty parcel has no site improvements, no designated parking area, no signage, and no city-provided amenities. The 1.16-acre portion of the property owned by Calvary University is designated as high-density residential and is also undeveloped.

22.     The City of Belton's Community Development Department Staff Report reviewing the Commons project notes that the designation of the city-owned parcel as commercial land from 2011 to 2024 provides "evidence that the subject property has been viewed for at least the past 14 years as an underutilized property not being used for its highest and best use."

*Figure 3: Photo of Plot Proposed for Commons of Belton Project*



23.     Prior to the rezoning denial, the Commons of Belton Plaintiffs had completed substantial pre-development projects. In addition to securing the low-income housing tax credits, the Commons of Belton Plaintiffs had completed or were nearing completion of the necessary civil engineering, architectural design, market study, site geological study, initial environmental site assessment, storm water management plan, and green development study.  In addition, the Commons of Belton Plaintiffs had executed a funding agreement with the City to initiate the process for securing Chapter 100 bonds, which provide sales tax exemptions on certain materials purchased for projects like the Commons that promote economic development.

24.     Had the City voted to rezone the City-owned parcel to a permitted use, construction of the Commons would have started as early as July 2025 with the first building ready for residents by January 2027, and full occupancy expected by January 2029.

25.     The Commons of Belton Plaintiffs include an experienced development team that has completed numerous residential and commercial projects in Missouri and neighboring states. Since 2016, Jabal Companies has developed or is developing at least thirteen residential projects including affordable and market-rate apartments, senior living complexes, and single-family home developments. Jabal Companies has developed five LIHTC affordable housing projects. Jabal Companies has also completed at least nine commercial projects, including six hotels and three retail centers. Jabal Companies is also currently developing a market-rate single family home development in the City of Belton.

### The Need for Affordable Housing in Belton

26.     The City of Belton and surrounding area has an existing and growing need for housing and particularly affordable housing units and housing for families.

27.     Belton's Comprehensive Plan describes that only 3.2% of all residential land is zoned for multi-family homes. Of the available multi-family apartment complex options in the City, only four offer 3-bedroom units, one of which is a mobile home park.

28.     Moreover, the City of Belton is home to numerous large industrial manufacturing and distribution warehouses, including the Chewy's eCommerce fulfillment center with approximately 1,200 employees; the QuikTrip distribution warehouse with approximately 600 employees; the Hillman Group's 305,000 square foot distribution hub; and the Progress Rail production facility. All of these warehouses are in Belton, less than two miles from the Commons site, and easily accessible to residents of the development. Also within two miles of the Commons site is the Center Point-KCS Intermodal Center, which is a major inland rail terminal, and Honeywell's Kansas City National Security Campus, which manufactures a large percentage of non-nuclear components for the United States' defense systems and employs over 7,000 workers.

29.     The growth of the City's commercial hub has substantially outpaced its housing stock. As the executive director of the Belton Chamber of Commerce, Dianne Huckshorn, recently said, "[O]ne of the areas that we have fallen behind on is [] housing. We don't have enough housing. We don't have new housing. We don't have multiple levels of housing." In particular, Ms. Huckshorn highlighted the need for "more choices for families."

30.     Indeed, the most recently constructed LIHTC property in the market area has over 200 households on its waiting list.

31.     The Commons site is located in Census Tract 601, which in 2024 was a Qualified Census Tract (QCT), meaning that more than 50% of households have incomes below 60% of the Area Median Gross Income or have at least a 25% poverty rate. In 2024 it was determined

that starting in 2025, Census Tract 601 would no longer be designated a QCT. Prior to this deadline, the Commons of Belton submitted and was approved for federal low-income housing tax credits, which are administered via Missouri's state housing finance agency, the Missouri Housing Development Commission (MHDC), and reserved for QCTs that allow the rental units in the development to be leased at an affordable rate. The project's location in a QCT provides a larger amount of LIHTC, making the project financially feasible with below-market rate rents. As of January 1, 2025, the City of Belton no longer has any QCTs.

32. There is a specific need in Belton for the Commons project. The market study for the Commons concluded that approximately 5,700 households in the primary market area would be income-eligible for units in the development and that the waiting lists for other affordable properties, combined with a lack of new high-quality affordable housing in the area, demonstrate a "high and pent-up demand" for developments like the Commons. The demand for affordable housing is further demonstrated by the housing choice voucher waiting list of approximately 4,500 applicants and wait times of up to three years.

33. The Belton Planning Commission highlighted that in 2023, the estimated median household income in the relevant census tract was $47,879, which was 58% of the Area Median Gross Income of the metro area.

34. Kansas City SmartPort, the industrial business attraction organization for the Kansas City Region, recognizes the area's need for affordable housing to attract and retain workers. The organization supported the Commons development as a project that would help ensure that Belton remains competitive in attracting new investments.

35. The site's approval for federal tax credits through the LIHTC program guarantees the development will provide affordable workforce housing. To qualify to rent an apartment, an

individual must be able to afford the below-market rate rent or have a sufficient rent subsidy and make below 60% of the Area Median Income. The Commons' LIHTC award is set to expire in December 2026. Absent the federal tax credits, the project would be financially infeasible, as a bank is unlikely to extend financing for a development with limited profitability resulting from below-market rental rates. Moreover, because Belton no longer has any QCTs, it would likely be impossible for any future developer in the City to qualify for the same level of federal tax credits as were awarded for the Commons.

36.     Because there are no longer any QCTs in Belton, federal tax credits are already secured, and significant progress has been made in the development process, the Commons of Belton project may be the only feasible project that could offer affordable workforce housing in Belton in the near term close to the growing employment center.

### The Demographics of the Belton Area

37.     The demographics of Belton and the surrounding area reflect patterns of residential segregation. Belton is a predominately white city. Just 8.7% of the approximately 10,000 households in Belton are Black while 81.0% of the households are white. In the market area from which the Commons would most likely draw tenants, 20.1% percent of households are Black—a percentage that is 2.3 times greater than the percentage of Black households in the City.

38.     The exclusion of the Commons, which would be available to renter households making within 30% and 60% of the Area Median Income, affects 22.5% of Black households in the rental market area but just 8.4% of white households in that area. An average Black household is 2.7 times more likely to be eligible to live in the Commons—but foreclosed from the opportunity by the City's actions—as compared to an average white household. When

considering households with housing choice vouchers, which would make units affordable to renter households making less than 30% the Area Median Income, 40.8% of Black households lost a potential housing opportunity as compared to just 14.5% of white households. With housing choice vouchers included in the analysis, an average Black household in the market area is 2.8 times more likely to be eligible for the Commons as compared to an average white household.

39.     The Commons would be significantly more integrated than the City of Belton and would have helped counter the patterns of segregation in the area. The Kansas City area has a Black-white dissimilarity index that exceeds 70, classifying it as an area with a high degree of residential segregation. Approximately 50% of the units in the Commons would be occupied by Black households while only 9% of all households in the City are Black. In contrast, less than 40% of units in the Commons would be occupied by white households even though they make up 81% of the population. The ratio of Black to white households in the Commons would be more than 12 times greater than the ratio in the general population. Preventing the development of the project perpetuates the segregation of the City, which has less than half the percentage of Black residents as compared to the surrounding area.

### The City's Initial Support for the Commons

40.     Plaintiff Jabal Companies first approached the City of Belton in 2022 about the possibility of building a multi-family residential complex, having identified a parcel for development that was not located in a QCT. Due to rising interest rates and the City's desire for affordable housing to meet its growing business needs, Plaintiff began looking elsewhere for a suitable parcel that was in a QCT and could be a location for an affordable development funded through tax credits.

41.     Plaintiff had originally identified a small parcel of land across the street from the Commons site that could accommodate approximately 108 units. However, when Plaintiff approached the City, the Mayor, City Manager, and Community Development Director suggested that Jabal Companies purchase the City's parcel, which could accommodate a much larger affordable housing development. The City offered to sell the property and rezone it so Plaintiff could build the larger-scale affordable workforce housing.

42.     In January 2024, City officials urged the Commons of Belton Plaintiffs to begin the application process for rezoning, expressing strong interest in the project. In the following months, the Commons of Belton Plaintiffs completed the initial planning activities for the development. The Commons of Belton Plaintiffs also discussed obtaining the adjacent Calvary University parcel and the University agreed to sell its land based on the participation and support of the City and the benefits the University would receive from the sale and the development once completed.

43.     Throughout the initial planning stages, the City continued to demonstrate its support for the project. On November 6, 2024, the City's Development Review Committee (DRC) reported in its Pre-Application Meeting Memo: "On behalf of the Community Development Department, and the entire City of Belton, we welcome this project to the City[.]"

44.     On November 26, 2024, the City Council approved moving forward with a letter of intent and a letter of support for the Commons. The Mayor signed the letter of intent the following day. The letter detailed the initial terms and conditions for acquisition of the "unimproved real property commonly known as 1150 Westover Road[.]" The letter of intent conditioned sale of the property on two things: (1) execution of any necessary agreements, such

as the purchase option agreement; and (2) the Commons' successful award of LIHTC from the MHDC.

45.     The City Community Development Director, Matt Wright, signed the letter of support for the tax credit application on November 27, 2024. The letter stated that although the subject property is zoned as parks and recreation, "[a]djacent properties include a mix of neighborhood commercial, medium-density residential, and high-density residential. Due to the nature of the surrounding neighborhood with a mix of land uses, a rezoning to a multi-family district would be supported" and meets the goals of the City's 2050 Comprehensive Plan. The letter was for the express purpose of showing that federal tax credits should be awarded based on the expectation that rezoning would be approved by the City.

46.     Upon approval of the City Council, the City and the Commons of Belton Plaintiffs entered into a Purchase Option Agreement for the 6.87 parcel for the Commons development. The Agreement is effective through November 27, 2025 with an option to extend for six months.

47.     On December 2, 2024, Calvary University also executed a Purchase Option Agreement with the Commons of Belton Plaintiffs. As part of the Agreement with Calvary, the Commons agreed to create a new soccer field for the University. The Agreement is effective through December 2, 2025 with an option to extend for six months. Calvary University agreed to sell its land based on the strong support from the City and specifically waited until the City signed the Purchase Option Agreement with the Commons of Belton Plaintiffs prior to executing the Agreement to sell its parcel.

48.     With the support from the City, the Commons project was conditionally approved for a tax credit for the property on May 5, 2025.

49.     The Commons development required a zoning change before development could begin. The 6.87 acres owned by the City is currently zoned as Parks, Recreation, & Public Use. That parcel would have to be rezoned as a Planned Unit Development (PUD) to move forward with the project. The Calvary University parcel is already zoned as Multi-Family – Planned Unit Development.

50.     The Commons of Belton Plaintiffs applied for the zoning change and the City's Community Development staff conducted an analysis of the request. The staff report considered the availability of the land, the need for the project, and development's alignment with the City's Comprehensive Plan. The staff report concluded:

*Availability of the Land*

a.  "Unlike other parks, the land has no site improvements. There is no designated parking area, signage identifying the site as a park, or any other site amenities. The only structures on the property are movable soccer goals."

b.  "During the drafting of the Comprehensive Plan, staff recommended not modifying the future land use designation for any parks and recreation areas. However, the land currently owned by Calvary University was designated as high-density residential as it is not out of character for the area with a mix of residential densities and institutional uses, including higher education with on-campus housing."

c.  "Additionally, high-density residential is a compatible transitional land use between increased business park/light industrial development to the north and lower-intensity land uses to the south and west, including the golf course. Although not incorporated into the 2024 Future Land Use Map, it is important to note that the 2011 Future Land Use Map update modified the future land use to Commercial, providing evidence that the subject property has been viewed for at least the past 14 years as an underutilized property not being used for its highest and best use."

*Need for the Project*

d.  "As of January 1, 2025, Belton does not have any QCTs, leaving this project as the only approved project that may take advantage of this program to help provide affordable workforce housing near growing employment centers."

e. "The subject property historically and currently generates zero taxes and is an underutilized City-owned property that could be put towards a more productive use."

f. "252 new households will increase sales tax generation for goods and provides additional customers for services. Furthermore, as the proposed housing units are affordable, this project meets a need for more affordable housing units to provide housing for growing employment sectors driven by continued economic growth in Belton, northwest Cass County, and south Kansas City. The subject property is located within 2 miles of multiple employment centers, including Southview Commerce Center, I-49 Commerce Center, and numerous employers along the Botts Rd and 150 Hwy. corridors."

g. "There is high demand and need for additional housing units in Belton in all formats from single-family to multi-level apartments. Since undeveloped zoned multi-family land is a rarity, an apartment development will almost always require a rezoning. Furthermore, rezoning the property to a PUD requires the property to be developed to the approved plan, which provides certainty to what will be developed. A Market Analysis completed in 2023 with the 2050 Comprehensive Plan showed that the City would need to accommodate at least 3,060 new housing units over the next 25 years (based on the historic growth rate of 1.0% annually), including 410 apartment units for households earning less than $50,000 annually. The proposed development accommodates a sector of the housing market that has unmet needs as rents continue to grow and affordable housing options become more limited."

*Alignment with the City's Comprehensive Plan Goals:*

h. Parks & Recreation / Goal 6: *Emphasize and invest in the need for more gathering places, or public space, through the development process and project evaluation to increase the city's level of service, including Strategy 6.2: Intentionally plan for and locate parks in areas currently undeserved or in need of parkland as new developments come online.*

    i. The subject property is in close proximity, including within short walking or biking distance, to four other parks that are developed and have capacity for new investment that could serve the proposed development.

i. Housing + Neighborhoods / Goal 5: *Support life-cycle housing types in Belton so current and future residents have access to homes at all ranges of income levels, including Strategy 5.5: Work to add multi-family options with multiple bedroom units.*

    i. The proposed development includes 3-bedroom units, a rarity in new apartment construction. These additional unit options provide

17

opportunities for a wider range of family types and formations to locate in new apartment units in Belton than what has been made available in recent years.

51.     The Community Development staff also evaluated the impact on traffic and available park land, finding neither as a concern. The report concluded that the increase in traffic from the development would not require turn lane or signal improvements and that the property is located in the area of the city with the highest concentration of park land, with three neighborhood parks and a regional park within walking distance.

52.     The primary way of travelling from the Commons site to Interstate 49 would be over Kansas City and not City of Belton roads. Water service to the development would be provided by Kansas City, sewer service by the Little Blue Valley Sewer District, and trash service would be provided by a private company hired by the Commons.

**Discriminatory Opposition to the Proposed Development Immediately Ends the Project**

53.     As part of the rezoning application process, the City posted notice of a public hearing on the Commons application. Immediately upon learning of the proposed multi-family affordable housing project, community members began a forceful campaign to prevent the development, expressing their opposition via email, social media, voicemails to City officials, and public comments at City hearings.

54.     The community members used racially charged language and employed insidious racial stereotypes and code words about the types of tenants who would live in affordable housing. These included references to public and affordable housing in predominantly minority communities, fears of increases in crime, suggestions of declining property values, and worries that Belton schools would be overrun by children and particularly children with special needs.

18

55.    During the May 6 Planning Commission meeting, members of the public voiced

concerns in person and via emails submitted before the hearing about outsiders—particularly

low-income outsiders—coming into Belton and degrading the quality of the town. For example:

     a.    "None of us in here are fools. And we all understand that the bottom line is it's going to lower our standard of living."

     b.    "I am concerned about the potential loss of our neighborhood's character and the displacement of existing residents."

     c.    "[M]ultifamily dwellings . . . bring crime no matter what."

     d.    "I mean, this is, this is not going to be a good thing for the community. It is going to be nothing but trouble."

     e.    "Belton's crime rate is sitting at 28.28 per thousand residents. We currently have 48 registered sex offenders that reside in the 64012 zip code. This high-density subsidized housing and developments can statistically increase those numbers. This is particularly concerning as we have schools neighboring by with youth areas and parks."

     f.    "High density and subsidized housing statistically correlates with increased crime, including property and violent crimes."

     g.    "An influx of 70 to 90 *high need* students would compromise learning environments across the district."

     h.    "I believe that this rezoning will negatively impact property values in our neighborhood, leading to more crime, increased property tax assessments, and difficulty selling homes."

56.    The Planning Commission voted unanimously, on May 6, 2025, after hearing the

public comments, to recommend denial of the rezoning application.

57.    Three weeks later, the City Council considered the request for rezoning.

58.    Prior to the meeting, numerous Belton residents emailed City Council members to

express opposition to the rezoning, reiterating many thinly veiled racial stereotypes and

euphemistic references to individuals expected to occupy the affordable housing development.

For instance:

19

a. "The section 8 housing plan sounds like it's not a great idea for our community. . . . We love Belton right now as it takes us away from the inner city crime."

b. "Don't turn Belton into Jackson County."

c. "The proposed development would significantly alter the character of the surrounding neighborhood and will negatively impact the quality of life and property values of existing residents."

d. "The community has repeatedly expressed a need for affordable housing. This is not that. Affordable housing supports working families. This is subsidized low-income housing with very different impacts—on crime, infrastructure, and public resources. Equating the two is both misleading and dangerous."

e. When raising concerns about "subsidized" housing increasing crime, one resident stated: "HUD Inspector General estimates 2,094 to 3,046 households subsidized nationally include registered lifetime sex offenders."

f. "[T]he city cannot with stand [sic] any more residents. The schools are already at max capacity. Low income usually also means increased needs. We already need more resources in special education. We already don't have enough resources for low income. Low income areas also bring increased crime. We don't need this for Belton!!"

g. "Belton is already stretched on infrastructure, traffic and most of all crime. When more and more buildings are coming in the crime is increased and that is not the town I want to live in."

59.     Much of the community opposition to the Commons was explicitly or implicitly grounded in discriminatory stereotypes and views about the likely residents of the development. Other more neutral-sounding objections were not supported by the facts of the development and its impact and are pretextual. Residents and city officials suggested that the development would eliminate needed park land and cause overcrowding in Belton schools. The reduction of park land assertion is belied by the fact that while the City-owned parcel is maintained by Parks & Recreation, it has no park, recreation, or athletic improvements or amenities and is identified in the 2050 Comprehensive Plan as an "undeveloped/redevelopment opportunity of city-owned property."

20

60.     The property is also located within short walking or biking distance to four developed parks and is in the area of the City with the highest concentration of park land. Markey Park, which is located less than one mile from the proposed development site, sits on 69 acres of land with five lighted baseball fields, a playground, a lighted walking trail, a concession stand, picnic tables, and restrooms.

61.     In addition, as part of the development, Calvary University was slated to receive a newly developed soccer field adjacent to the Commons that it would allow Belton residents to use for free. The Commons of Belton also pledged to donate $100,000 to Belton Parks & Recreation to build new practice fields. At the City Council meeting, the City's Community Development Department continued to recommend the approval of the project.

62.     Assertions that the development would overburden an already strained school system are also demonstrably false and misleading, serving as pretext for discriminatory motives.

63.     Residents asserted that the City's public schools were operating at or beyond capacity and lacked the resources to accommodate an influx of additional students—particularly those they baselessly perceived as "high-need" children who might require greater educational support and services.

64.     At the May 27 City Council meeting, one Councilmember confirmed and emphasized that this is not true. The City's schools are not strained or struggling to meet current student needs. The number of students enrolled in the Belton School District has declined each year for at least the last five years.

65.     Despite many months of the City supporting the project, after the discriminatory reaction from City residents, the City Council voted unanimously to deny the rezoning request. The denial precluded the development from proceeding. The City's treatment of the Commons

development stands in contrast to the City's approval of Jabal Companies' single-family homes project, which would be expected to be occupied by a much smaller proportion of Black households and families. This project is currently under development.

66.     Subsequent to the rezoning denial, the Commons of Belton Plaintiffs informed the City of the discriminatory effect of its decision and the discriminatory motivation of the residents whose opposition led to the denial. The City did not respond to the provided information regarding possible fair housing violations.

## INJURY TO PLAINTIFFS

67.     As a proximate result of the acts and practices described above, Plaintiffs have suffered, continue to suffer, and will suffer in the future, great and irreparable loss and injury, including but not limited to economic losses. The Commons of Belton Plaintiffs have expended time and monies on the development and will lose substantial income, including a developer fee, management income, and property value increases. The Commons of Belton Plaintiffs have lost opportunities to pursue other projects, and the denial of the Commons has affected their reputation and ability to secure funding. The Commons of Belton Plaintiffs have also been deprived of the ability to develop affordable housing for families with children that is racially integrated and free from discrimination based on race and familial status. Plaintiff Calvary University has lost the opportunity to provide expanded athletic team options to its students, suffered a decline in enrollment, a loss of reputation, and have had their accreditation status threatened. Defendants' actions also injure the intended beneficiaries of the Commons of Belton Plaintiffs' proposed development.

68.     The Commons of Belton Plaintiffs expended substantial time and resources preparing for the development of the Commons. The Commons of Belton Plaintiffs have

expended over $500,000 in land acquisition costs. The Commons of Belton Plaintiffs have expended over $200,000 in pre-development costs. The current interest due to be paid by the Commons of Belton Plaintiffs on funds contributed by investors is approximately $20,000 and increasing. The Commons of Belton Plaintiffs would have received over $3.6 million in general contractor, general requirements, and builders' overhead fees were it not for Defendants' actions.

69.     The Commons of Belton Plaintiffs have lost opportunities to begin other developments or engage in additional construction at ongoing projects because of the time and resources expended on the Commons. The denial of the Commons project has affected the Commons of Belton Plaintiffs' business reputation and MHDC will not accept additional tax credit applications from the Commons of Belton Plaintiffs because of the status of the Commons project. The Commons of Belton Plaintiffs will also face greater difficulty purchasing property in the future given the reluctance of land sellers to enter into options contracts with a developer who has failed to exercise past options as the Commons of Belton Plaintiffs have been forced to do in Belton.

70.     As the manager of the Commons the Commons of Belton Plaintiffs would have received approximately $15 million in income from the project over the 15-year tax credit compliance period. In addition, as the owner of the property the Commons of Belton Plaintiffs would have seen a property value increase of approximately 4% per year, representing a loss of over $51 million over the 15-year compliance period of the tax credits.

71.     Plaintiff Calvary University also expended substantial time and resources negotiating and planning for the sale of land and construction of their soccer field. Because of Defendants' discriminatory refusal to rezone their portion of the land, the Commons of Belton will be unable to use the property for the purpose of developing the project, and therefore will

not exercise the option to purchase the property from Defendants and Plaintiff Calvary University.

72.      Plaintiff Calvary University will not receive the competitive soccer field necessary to build its women's soccer program and expand its men's soccer program. Calvary had recruited and accepted students specifically to play soccer. Most of those accepted students chose not to matriculate because Calvary did not have a usable soccer field and a fully rostered team—causing loss of tuition income for unfilled spots. Moreover, the University was also required to lay off staff as a result of the decline in expected enrollment and lack of resources and funding to continue building out the soccer program. Upon the exercise of the option to purchase the Calvary University property, the Commons of Belton Plaintiffs would have paid Calvary University a purchase price of $50,000.  With the rezoning denied, the Commons of Belton Plaintiffs did not exercise the option and Calvary University lost the potential income.

73.      Calvary University's ability to recruit students has been diminished, especially since its accreditation may be affected due to the drop in enrollment from the loss of the soccer program. Calvary University's students also lose the opportunity for affordable housing in walking distance to their school, which would have additionally helped in the University's recruitment efforts.

74.      Plaintiff Calvary University has lost the potential income of having a competitive soccer field it could use to host tournaments, rent out, and attract more students and donors to support its school.

75.      The Commons of Belton Plaintiffs continue to seek to build the proposed workforce housing development. Defendants' actions prevent Plaintiffs from pursuing the

development, which would provide much-needed housing opportunities for lower income families and individuals in Belton and surrounding areas.

## CAUSES OF ACTION

### COUNT I
**Discrimination in Violation of the Fair Housing Act, 42 U.S.C. §§ 3604, 3617**
**(All Plaintiffs Against All Defendants)**

76.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 75 as fully set forth herein.

77.     Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

78.     Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

79.     Defendants are further liable under 42 U.S.C. § 3617, under which:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Defendants' actions have interfered with Plaintiffs' efforts to build and operate a workforce housing development, which would disproportionately benefit Black prospective tenants and families with children, in a manner free from discrimination.

25

80.     Defendants' actions to block Plaintiffs' proposed workforce housing development are and have been based on discriminatory motives related to the race and familial status of the likely tenants of the proposed community, specifically the likelihood that the tenant population of the community will disproportionately include Black individuals and families with children.

81.     Defendants' actions also have a disproportionate adverse effect on Black individuals and have the effect of perpetuating racial segregation in Belton.

82.     Defendants' actions interfering with Plaintiffs' proposed workforce housing development are and have been based on discriminatory motives related to the race and familial status of the likely tenants of the development, specifically the likelihood that the tenant population of the development will include many Black individuals and families with children.

83.     Defendants' conduct was intentional, willful, and in reckless disregard of the known rights of others.

## COUNT II
### Tortious Interference with a Business Expectancy
### (All Plaintiffs Against All Defendants)

84.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 75 as fully set forth herein.

85.     As described above, Commons of Belton Plaintiffs and Plaintiff Calvary University had a valid business relationship, as memorialized in a valid purchase option contract for the Commons to purchase the 1.16-acre land parcel from Calvary and build a soccer field for the school.

86.     Defendants had knowledge of the contract and business relationship between Plaintiffs because Defendants were involved in discussions to secure and purchase the property,

in tandem with the city-owned parcel, so that a sufficiently large housing development could be built in the space.

87.     Defendants intentionally interfered with Plaintiffs' business relationship by yielding to the discriminatory objections of certain Belton citizens and denying the rezoning of the city-owned land parcel. As a direct result of Defendants' actions, the purpose of the Purchase Option contract between Plaintiffs Commons of Belton Plaintiffs and Calvary University was rendered effectively futile, since the housing development could not proceed on the 1.16-acre parcel alone.

88.     Defendants provided no justification for their conduct, and City Council members used improper discriminatory means in violation of the Fair Housing Act to pursue their self-interests of reelection at the expense of Plaintiffs and the broader Belton community. Defendants' actions to deny the rezoning of the workforce housing development are based on discriminatory motives related to race and familial status of the likely tenants of the proposed community.

89.     As described above, as a direct result of Defendants' tortious interference with Plaintiffs' contract and business relationship, Plaintiffs have lost business and profits resulting in damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)     enter a declaratory judgment that the actions of Defendants complained of herein are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-3631;

(b)     issue an injunction restraining Defendants, their agents, employees, representatives, and successors, or any other person acting directly or indirectly with them from

unlawfully interfering with Plaintiffs' development and from taking any further action that would hinder, delay, or obstruct Plaintiffs' development of the proposed workforce housing community, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein;

(c)     award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

(d)     award punitive damages in an amount to be determined by the jury;

(e)     award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(f)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

Dated:  November 24, 2025

Respectfully submitted,

/s/ Casey J. Symonds
Casey J. Symonds
Missouri Bar Number: 59409
SYMONDS LAW KC, LLC
1616 W. 45th St.
Kansas City, MO 64111
Phone: (816) 463-2311
casey@symondslawkc.com

Reed Colfax*
Yiyang Wu*
Megan Russo*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
rcolfax@relmanlaw.com
mrusso@relmanlaw.com
* *Pro hac vice* Motions to be submitted

*Attorneys for Plaintiffs*

28